# NO. 12-18-00323-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *CARLOS EDWARD HULL,*<br>*APPELLANT* | § | *APPEAL FROM THE 3RD* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *ANDERSON COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Carlos Edward Hull appeals nine convictions for forgery and one conviction of engaging in organized criminal activity. In two issues, Appellant argues that he was denied his constitutional right to a speedy trial and the evidence is insufficient to support the trial court's judgment. We affirm.

## BACKGROUND

Appellant was arrested on December 22, 2016, and on March 1, 2017, was charged by indictment with nine counts of forgery and one count of engaging in organized criminal activity. Appellant pleaded "not guilty" to each charged offense, and, on October 9, 2018, the matter proceeded to a jury trial. The jury found Appellant "guilty" as charged on each count. Following a trial on punishment, the jury assessed Appellant's punishment at imprisonment for ten years for each of the nine forgery convictions and fifty-five years for his conviction of engaging in organized criminal activity. The trial court sentenced Appellant accordingly, and this appeal followed.

## RIGHT TO SPEEDY TRIAL

In his first issue, Appellant contends that the trial court improperly denied his motion for speedy trial. The essential ingredient of the Sixth Amendment's speedy trial guarantee is "orderly

expedition and not mere speed." *U.S. v. Marion*, 404 U.S. 307, 313, 92 S. Ct. 455, 459, 30 L. Ed. 2d 468 (1971) (Sixth Amendment right to speedy trial would appear to guarantee criminal defendant that Government will move with dispatch that is appropriate to assure him early and proper disposition of charges against him).  Since 1972, United States Supreme Court precedent has required courts to analyze federal constitutional speedy trial claims "on an ad hoc basis" by weighing and then balancing four factors:  (1) length of the delay; (2) reason for the delay; (3) assertion of the right; and (4) prejudice to the accused.  *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192, 33 L. Ed. 2d 101 (1972).  This balancing test requires weighing case by case "the conduct of both the prosecution and the defendant."  *Id.*  No single factor is a "necessary or sufficient condition to the finding" of a speedy trial violation.  *Id.*, 407 U.S. at 533, 92 S. Ct. at 2193; *State v. Wei*, 447 S.W.3d 549, 553 (Tex. App.–Houston [14th Dist.] 2014, pet. ref'd).  The related factors must be considered together with such other circumstances as may be relevant.  *See Wei*, 447 S.W.3d at 553.

In reviewing the trial court's decision on Appellant's speedy trial claim, we apply a bifurcated standard of review.  *See State v. Munoz*, 991 S.W.2d 818, 821 (Tex. Crim. App. 1999).  We review factual issues for abuse of discretion and review legal issues de novo.  *Id.*  Because the trial court ruled against Appellant on his motion to dismiss, we must presume the trial court resolved any disputed fact issues in the State's favor, and we are required to defer to these implied findings of fact that the record supports.  *See id.*

In this case, we conclude that the approximately nineteen month delay between the time of the formal charge against Appellant and the time his trial commenced meets the first factor and triggers analysis under the remaining *Barker* factors.  *See, e.g., id.* at 822 (delay of seventeen months between time of the appellant's arrest and the date of speedy trial hearing).

**Reason for the Delay**

Under *Barker*, "different weights should be assigned to different reasons" for the delay.  *Barker*, 407 U.S. at 531, 92 S. Ct. at 2192.  A "deliberate attempt to delay the trial" should be weighed heavily against the government.  *Id.*  A "more neutral reason[,] such as negligence or overcrowded courts[,] should be weighed [against the government] less heavily."  *Id.*  A valid reason for the delay should not be weighed against the government at all.  *Id.* (valid reason for the delay "should serve to justify appropriate delay").  And delay which is attributable in whole or in part to the defendant may even constitute a waiver of a speedy trial claim.  *Id.*, 407 U.S. at 528–

30, 92 S. Ct. at 2191–92 (delay attributable to defendant constitutes waiver of speedy trial); *see also **Dickey v. Florida***, 398 U.S. 30, 48, 90 S. Ct. 1564, 1574, 26 L. Ed. 2d 26 (1970) (Brennan, J., concurring) (defendant may be "disentitled to the speedy trial safeguard in the case of a delay for which he has, or shares, responsibility").

The burden of excusing the delay rests with the state, and in light of a silent record or one containing reasons insufficient to excuse the delay, we must presume that no valid reason for the delay existed. *See **Turner v. State***, 545 S.W.2d 133, 137–38 (Tex. Crim. App. 1976). As such, the state's failure to secure Appellant's presence at trial while Appellant was incarcerated will weigh against the state. But absent evidence of intent, we will not weigh the factor so heavily as we would were there evidence of intentional conduct on the state's part. *See **Barker***, 407 U.S. at 531, 92 S. Ct. at 2192.

The record in this case reflects that Appellant was arrested on December 22, 2016, and originally was charged with the offenses on March 1, 2017.[1] Appellant was arraigned on April 13, 2017, at which time, the trial court signed a scheduling order.

On August 21, 2017, the State filed a motion for continuance, in which it requested more time to prepare for trial due to computer forensics information's "not [being] back." On August 24, 2017, the State announced "not ready" for trial without further explanation. The State's motion for continuance contains no accompanying information regarding the underlying reason for its delay in obtaining the necessary computer forensic information, and the trial court did not rule on the State's motion. We conclude that the reason for this delay should weigh against the State, but not heavily.

On October 27, 2017, the case was reset by agreement. We do not weigh this delay against either party. On February 12, 2018, the case was reset without explanation, a delay we weigh against the State, but not heavily.

On June 22, 2018, the trial court's docket entry sets forth that Appellant was "with atty, not ready for trial" set for August 24, 2018. That docket entry further sets forth that trial was reset for September 10, 2018. This reset weighs against Appellant.

On August 14, 2018, Appellant filed his motion for speedy trial. At the September 10, 2018, trial setting, Appellant's case was reached, but Appellant's trial counsel, though ready, was ill the night before and expressed concerns that his illness could affect his ability to offer effective

---

[1] The State filed a superseding indictment on June 27, 2018.

assistance. Appellant testified before the trial court that he would prefer that his attorney feel better while representing him at trial. Thereafter, Appellant requested a November 13, 2018, trial setting. Appellant acknowledged to the trial court that this decision could impact his right to a speedy trial. This delay also weighs against Appellant's motion.

Ultimately, Appellant's case was tried on October 9, 2018.

## Assertion of Federal Constitutional Right to Speedy Trial

Under *Barker*, a defendant is responsible for asserting or demanding his right to a speedy trial. *See Barker*, 407 U.S. at 528–29, 92 S. Ct. at 2191. Although a defendant's failure to assert his speedy trial right does not amount to a waiver of that right, "failure to assert the right . . . make[s] it difficult for a defendant to prove he was denied a speedy trial." *Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003). This is because a defendant's lack of a timely demand for a speedy trial indicates strongly that he did not really want a speedy trial and that he was not prejudiced by a lack thereof. *See id.* Furthermore, the longer the delay, the more likely it becomes that a defendant would take some action to obtain a speedy trial. *See id.* Thus, inaction weighs more heavily against a violation the longer the delay becomes. *Id.*

Here, Appellant filed his motion on August 14, 2018, more than seventeen months after the date he originally was charged with the offenses at issue. However, there is no evidence that Appellant actively sought a hearing on his motion. *See Zamorano v. State*, 84 S.W.3d 643, 652 n.44 (Tex. Crim. App. 2002) (citing *Cook v. State*, 741 S.W.2d 928, 940 (Tex. Crim. App. 1987), *vacated and remanded on other grounds*, 488 U.S. 807, 109 S. Ct. 39, 102 L. Ed. 2d 19 (1988)) (assertion of right factor weighs against appellant where there is no evidence beyond motions for speedy trial filed with district clerk that appellant asserted right to speedy trial by requesting hearings to present evidence on the matter). Thus, we conclude that even though Appellant eventually filed a speedy trial motion, his failure to seek a hearing at which to present evidence on the matter causes this factor to weigh against him. *See id.*

## Prejudice

The last *Barker* factor is "prejudice to the defendant." *Barker*, 407 U.S. at 532–33, 92 S. Ct. at 2193–94. Prejudice is assessed in light of the interests that the speedy trial right is designed to protect. *Id.* These interests are (1) preventing oppressive pretrial incarceration, (2) minimizing the anxiety and concern of the accused, and (3) limiting the possibility that the defense will be impaired. *Id.* Of these interests, "the most serious is the last, because the inability

4

of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.* Although a defendant has the burden to make some showing of prejudice, actual prejudice is not required. *See Munoz*, 991 S.W.2d at 826. When a defendant makes a prima facie showing of prejudice, the state must prove that the accused suffered no serious prejudice beyond that which ensued from the ordinary and inevitable delay. *Id.* Excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove. *See Doggett v. U.S.*, 505 U.S. 647, 655, 112 S. Ct. 2686, 2693, 120 L. Ed. 2d 520 (1992). Yet such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria. *Id.*, 505 U.S. at 656, 112 S. Ct. at 2693. But when the state's negligence causes extraordinary delay and when the presumption of prejudice, whether specified or presumed, is neither extenuated, as by the defendant's acquiescence, nor persuasively rebutted by the state, the defendant is entitled to relief. *Id.*, 505 U.S. at 658, 112 S. Ct. at 2694.

In this case, Appellant argued in his motion that he would be prejudiced if his trial were not held before September 10, 2018, because he had been incarcerated for nearly two years and had witnesses that may become unavailable with delay.

With regard to the length of time before trial, we conclude that the two-year delay was not excessive enough to presumptively compromise the reliability of a trial. *See State v. Wray*, No. 05-01-01799-CR, 2002 WL 1763567, at *4 (Tex. App.–Dallas July 31, 2002, pet. ref'd, untimely filed) (op., not designated for publication) (delay of twenty-five months not presumptively prejudicial even though sufficient to trigger *Barker* analysis) (citing *Sanders v. State*, 978 S.W.2d 597, 605 (Tex. App.–Tyler 1997, pet. ref'd)); *see also Clarke v. State*, 928 S.W.2d 709, 717 (Tex. App.–Fort Worth 1996, pet. ref'd) (concluding no presumptive prejudice in case where delay in bringing appellant to retrial on punishment was two years and five months after Supreme Court denied certiorari and five months after appellant filed motion for speedy retrial); *but see Dragoo*, 96 S.W.3d at 312 (concluding three-and-one-half-year delay in which appellant played no role is patently excessive).

Further, we cannot conclude that the purportedly prejudicial deadline set forth in Appellant's motion is unyielding in light of the fact that on September 10, 2018, Appellant testified in support of further delaying the trial due to his counsel's illness. Moreover, despite the reset of Appellant's trial to November 13, 2018, the case ultimately was tried on October 9, 2018, less than one month after the prejudicial deadline Appellant proposed in his motion. Thus, having carefully

5

considered and weighed each of these assertions, we conclude that this factor weighs against Appellant.

**Balancing the *Barker* Factors**

We now consider and weigh the aforementioned factors. The reasons for the delay, in two instances, are attributable to the State, but only on a "negligence" level. *See **Barker***, 407 U.S. at 531, 925 S. Ct. at 2192. Moreover, we cannot overlook that the State and Appellant agreed to one of the delays, while two other delays are attributable to Appellant. From the record, we cannot conclude that this factor weighs more heavily against either party. And despite the fact that Appellant filed a motion for speedy trial, there is no indication he sought a hearing on the matter. Thus, this factor weighs against him. *See **Zamorano***, 84 S.W.3d at 652 n.44; *see also **Cantu v. State***, 253 S.W.3d. 273, 283 (Tex. Crim. App. 2008). Lastly, the prejudice prong weighs in the State's favor because, as previously discussed, the record does not support that Appellant's ability to defend his case was compromised, and Appellant sought to delay the case further after the purportedly prejudicial deadline set forth in his motion. *See **Munoz***, 991 S.W.2d at 826. Thus, having considered the aforementioned factors and the entirety of the record, we conclude that the factors weigh against Appellant. *See **Barker***, 407 U.S. at 539, 92 S. Ct. at 2182. Therefore, we hold that Appellant's right to a speedy trial was not violated. Appellant's first issue is overruled.

**EVIDENTIARY SUFFICIENCY**

In his second issue, Appellant argues that the evidence is insufficient to support his convictions for forgery and engaging in organized criminal activity.

**Standard of Review**

The ***Jackson v. Virginia***[2] legal sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the state is required to prove beyond a reasonable doubt. *See **Brooks v. State***, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). Legal sufficiency is the constitutional minimum required by the Due Process Clause of the Fourteenth Amendment to sustain a criminal conviction. *See **Jackson***, 443 U.S. at 315–16, 99 S. Ct. at 2786–87; *see also **Escobedo v. State***, 6 S.W.3d 1, 6 (Tex. App.–San Antonio 1999, pet. ref'd). The standard for reviewing a legal sufficiency challenge is whether any rational trier of fact could have found the essential elements of the offense

---

[2] 443 U.S. 307, 315–16, 99 S .Ct. 2781, 2786–87, 61 L. Ed. 2d 560 (1979).

beyond a reasonable doubt. *See Jackson*, 443 U.S. at 320, 99 S. Ct. at 2789; *see also Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). The evidence is examined in the light most favorable to the verdict. *See Jackson*, 443 U.S. at 320, 99 S. Ct. at 2789; *Johnson*, 871 S.W.2d at 186. A jury is free to believe all or any part of a witness's testimony or disbelieve all or any part of that testimony. *See Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.–Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006). A successful legal sufficiency challenge will result in rendition of an acquittal by the reviewing court. *See Tibbs v. Florida*, 457 U.S. 31, 41–42, 102 S. Ct. 2211, 2217–18, 72 L. Ed. 2d 652 (1982).

Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Rodriguez v. State*, 521 S.W.3d 822, 827 (Tex. App.–Houston [1st Dist.] 2017, no pet.) (citing *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011)). Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Juries are permitted to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial. *Id.* at 15. Juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions. *Id.* An inference is a conclusion reached by considering other facts and deducing a logical consequence from them, while speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. *Id.* at 16.

The sufficiency of the evidence is measured against the offense as defined by a hypothetically correct jury charge. *See Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge would include one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant is tried." *Id.*

**Evidence at Trial**

In the instant case, the jury heard testimony that Casey Williamson passed forged currency at a Sonic restaurant in Palestine, Texas, as well as testimony that he had more forged currencies in his possession when he was contacted by law enforcement officers. Williamson indicated to officers that he obtained the counterfeit currency from Christopher Aherns and Michael Sharples.

7

As a result, Palestine Police Detective James Heavner obtained a search warrant for Sharples and Aherns's shared residence.[3] Upon execution of the search warrant, officers seized multiple printers/scanners, various forged currencies, and forged driver's licenses.[4] These forged driver's licenses contained the images of three individuals—Sharples, Aherns, and Appellant.

Evidence obtained from a cellular telephone seized from Sharples and Aherns's residence demonstrated that Aherns and Appellant had a text conversation regarding the fake licenses and forged currency. Specifically with regard to the forged currency, Aherns texted Appellant, "Hey, you still have them washed dills [$$]." Appellant responded, "No." Aherns also texted Appellant, "Hey, bro. Hit me up. I need to holla at you about making $$." The text messages between Aherns and Appellant are dated December 19, 2016, the day prior to the execution of the search warrant at Sharples and Aherns's residence.

As the investigation progressed, investigators applied for a search warrant for Appellant's residence. When officers executed the search warrant at Appellant's residence, they recovered similar items to those recovered from Sharples and Aherns's residence, including similar printers/scanners, white printer paper, multiple identifying documents of other people, and an X-ACTO knife. They also discovered burned, forged currency in the front yard and in a fire pit in the backyard. Some of the items were discovered in Appellant's bedroom, including items belonging to other individuals such as a social security card for Lisa LaRue, a social security card for Lisa Harmon, and multiple credit cards and insurance cards for Mary Simien, Alice Rogers, or Mary Rogers. The search of Appellant's residence occurred two days after the search performed at Sharples and Aherns's residence.

Further, the jury heard a recording of admissions Appellant made to his mother during a conversation the two had when she visited Appellant in jail. In the recording of this conversation, Appellant's mother asks him how he became involved, and Appellant answers, "They found my picture at somebody's house." Appellant's mother later asks Appellant, "Were you outside burning?" Appellant responds, "Yes." When Appellant's mother asks him why he was burning, he responds, "Because I didn't want it." His mother then asks, "Whose was it?" Appellant responds, "Somebody else's." She next asks why Appellant did not tell law enforcement that it

---

[3] This residence was owned by Sharples.

[4] Further, a search of Sharples's vehicle was conducted, and officers seized receipts for ink cartridges, which were the same as the printers discovered at the residence.

was someone else's, and he answers, "I mean, I didn't know they found it." Appellant later tells his mother, "But Mom, it wasn't real. It was just printed out. It wasn't real money." His mother responds, "It's still counterfeit, Mijo[,]" and Appellant responds, "I know."

William Mack testified that he is the resident agent in charge of the Tyler Office for the United States Secret Service. He further testified that all currencies obtained from Sharples and Aherns's residence and the currencies obtained from Appellant's residence were forgeries, which were not produced with the authorization of the United States Treasury.[5]

Heavner testified that the use of the all-in-one printer/scanner equipment seized was important because that type of printer/scanner does not have a mechanism to prevent the copying of United States currency. He further testified regarding how an X-ACTO knife typically is used in committing a forgery so as to produce a bill or check with a "pretty straight edge[.]"

The jury also had the opportunity to consider the testimony of several defense witnesses after the State rested its case. Jonathan Simien, a graphics designer, claimed to own the X-ACTO knife, printers, and printer paper located at Appellant's residence. However, during the presentation of rebuttal evidence, the jury heard a recording of a phone call between Appellant and Gina Carreno from the previous day, in which Appellant instructs Carreno to contact Simien and tell him that the "printer was used just for his personal use and not for anything else."

## Forgery - Counts 1–8

To prove that Appellant is "guilty" of the first eight counts of forgery, the State was required to demonstrate in each instance that he, with intent to defraud or harm another, altered or made or completed a writing so that it purported to be the act of the Treasurer of the United States, who did not authorize the act, and the writing was U.S. Currency. *See* TEX. PENAL CODE ANN. §§ 32.21(a)(1)(A)(i), (a)(2), (b) (West Supp. 2019). The court's charge to the jury authorized his conviction on these counts either as a principle or as a party. "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id.* § 7.01(a) (West 2011). A "person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2).

---

[5] In conjunction with his testimony that the notes were forged, Mack was shown and identified each note as set forth in the indictment. The various notes also were introduced into evidence as exhibits.

Here, as previously set forth in greater detail, the evidence established that Williamson indicated to officers that he received the forged currency found in his possession from Aherns and Sharples. During the ensuing search of Sharples and Aherns's residence, officers located forged currency as well as fake driver's licenses with Sharples's, Aherns's, and Appellant's pictures on them. In addition to the link to Sharples and Aherns provided by Appellant's picture on the fake driver's license, information recovered from Aherns's phone demonstrated that he and Appellant recently engaged in text conversation regarding the fake licenses and the forged currency the day prior to the execution of the search warrant at Sharples and Aherns's residence.

Further, during the search of Appellant's residence, officers discovered similar evidence to the evidence found at Sharples and Aherns's residence, including similar printers/scanners, white printer paper, several identifying documents for other people, and an X-ACTO knife. Officers also found burned, forged currency outside the residence. The search of Appellant's residence took place two days after the search of Sharples and Aherns's residence, and the jury reasonably could determine that Appellant became aware that law enforcement discovered the evidence linking him to Sharples and Aherns and took the opportunity in the meantime to destroy the evidence of the forged currency in his possession. Further still, during the recording of their conversation, Appellant conveyed to his mother his awareness that law enforcement discovered evidence linking him to Sharples and Aherns.

Lastly, Mack testified that all currencies obtained from Sharples and Aherns's residence and the currency obtained from Appellant's residence were forgeries and not produced with the authorization of the United States Treasury.

Based on our review of the entirety of the record, including the aforementioned evidence, we conclude that the jury reasonably could have found beyond a reasonable doubt that Appellant, as a party, with intent to defraud or harm another, altered or made or completed a writing so that it purported to be the act of the Treasurer of the United States, who did not authorize the act, and the writing comprised eight notes of United States currency of certain denominations and serial numbers. *See* TEX. PENAL CODE ANN. §§ 7.01(a), 7.02(a), 32.21(a)(1)(A)(i), (a)(2), (b).

**Forgery - Count 9**

To prove that Appellant is "guilty" of the ninth count of forgery, the State was required to demonstrate that he, with intent to defraud or harm another, altered or made or completed a writing so that it purported to be the act of the Treasurer of the United States, who did not authorize the

act, and the writing was U.S. Currency. *See* TEX. PENAL CODE ANN. §§ 32.21(a)(1)(A)(i), (a)(2), (b). The court's charge to the jury authorized his conviction on this count only as a principle, not as a party.

Here, the currency at issue is a one hundred dollar bill with the serial number DB45683872B. This partially burned note was located outside Appellant's residence during the search of the premises. Mack testified that this currency was counterfeit or forged and was produced without the authorization of the United States Treasury.

Moreover, the jury was able to consider the other items discovered at Appellant's residence in context of its consideration of the items found at Sharples and Aherns's residence, such as two all-in-one printers/scanners and white printer paper. Heavner testified that the all-in-one printer/scanner equipment was important because that type of printer/scanner does not have a mechanism to prevent the copying of U.S. currency. He also discussed the discovery of an X-ACTO knife and its utility in creating forged currency.

As set forth previously, officers retrieved text messages from Aherns's phone between him and Appellant, which demonstrate that Appellant was himself producing forged currency. Further, the jury was entitled to consider Appellant's admission that he burned the currency when it listened to the recorded conversation between Appellant and his mother.

Based on our review of the entirety of the record, including the aforementioned evidence, we conclude that the jury reasonably could have found beyond a reasonable doubt that Appellant, with intent to defraud or harm another, altered or made or completed a writing so that it purported to be the act of the Treasurer of the United States, who did not authorize the act, and the writing was United States Currency purporting to be a one hundred dollar bill with the serial number DB45683872B. *See id.*

## Engaging in Organized Criminal Activity

To prove that Appellant is "guilty" of engaging in organized criminal activity, the State was required to demonstrate that (1) he, with the intent to establish, maintain, or participate in a combination consisting of himself, Sharples, and Aherns, (2) committed or conspired to commit forgery by agreeing with each other that they would engage in conduct that constituted that offense, and (3) Appellant, Sharples, or Aherns performed an overt act in pursuance of the agreement by (a) supplying equipment for the creation of forged currency, (b) possessing forged currency, (c) passing forged currency, or (d) attempting to cover up or destroy evidence of the forgery. *See*

11

TEX. PENAL CODE ANN. §§ 15.02(a) (West 2019), 71.02(a)(8) (West Supp. 2019). An agreement constituting a conspiracy may be inferred from acts of the parties. *See id.* § 15.02(b) (West 2019).

Section 71.01(a) defines a "combination" as three or more persons who collaborate in carrying on criminal activities. *Id.* § 71.01(a) (West 2011). The court of criminal appeals has construed this language as requiring a "continuing course of criminal activities." *Nguyen v. State*, 1 S.W.3d 694, 697 (Tex. Crim. App. 1999); *Lashley v. State*, 401 S.W.3d 738, 743 (Tex. App.– Houston [14th Dist.] 2013, no pet.). It involves more than the intent to merely commit an enumerated offense, a plan to commit a single act, or proof of working jointly to commit a crime— it requires proof of continuity. *Hart v. State*, 89 S.W.3d 61, 63–64 (Tex. Crim. App. 2002); *Nguyen*, 1 S.W.3d at 696–97. The activities do not have to individually be criminal offenses to satisfy the statutory requirement, and a single criminal offense can be sufficient. *Nguyen*, 1 S.W.3d at 697; *see also* **Dowdle v. State**, 11 S.W.3d 233, 236 (Tex. Crim. App. 2000) (continuous activities after shooting included fleeing, regrouping, discussing plan of action, and traveling to another country with stolen goods). However, the statute requires proof of intended continuity, i.e., that "the appellant intended to establish, maintain, or participate in a group of three or more, in which the members intend to work together in a continuing course of criminal activities" that goes beyond a single, *ad hoc* effort. *Nguyen*, 1 S.W.3d at 697. Evidence must be offered that allows a jury to infer that the group intended to continue engaging in illegality over a period of time. *See* **Lashley**, 401 S.W.3d at 745.

As set forth previously, the jury heard testimony about Williamson's having passed a forged currency note at a Sonic restaurant and that he had more forged currencies in his possession when he was contacted by law enforcement. Based on the information they obtained from Williamson,[6] officers obtained and executed a search warrant at the trailer home owned by Sharples, where both Sharples and Aherns resided. Upon execution of the search warrant, officers discovered and seized printers/scanners, various forged currencies, and forged driver's licenses, which had pictures of Sharples, Aherns, and Appellant on them. Officers also searched Sharples's vehicle, in which they discovered receipts for ink cartridges, which were compatible with the printers discovered in the residence.

---

[6] Heavner testified that Williamson told him that he received the money from Aherns and Sharples for some other purpose. Heavner testified that Williamson did not appear to be aware that the money was counterfeit, and he was not arrested in conjunction with any of the forgeries charged in this case.

Pursuant to a warrant, officers searched Appellant's residence, where they discovered burned, forged currency in the front yard as well as burned, forged currency in a fire pit in the back yard. Their search of the interior of Appellant's residence revealed three all-in-one printers/scanners similar to the equipment seized at Sharples and Aherns's residence, as well as multiple credit cards, a check located on one of the printers/scanners, and an X-ACTO knife.

Officers discovered in Appellant's room several items belonging to other individuals, including a social security card for Lisa LaRue, a social security card for Lisa Harmon, multiple credit cards and insurance cards for Mary Simien, Alice Rogers, or Mary Rogers. Officers also found white printer paper in Appellant's closet. This evidence was corroborative of the evidence seized from Sharples and Aherns's residence and linked Appellant to the forgeries observed there.

The text messages between Aherns and Appellant retrieved from Aherns's phone further link Appellant to the criminal activity undertaken by Sharples and Aherns. The substance of the messages, which is set forth previously, demonstrate Appellant's direct involvement in the forgery operation. Moreover, the jury was entitled to infer from these text messages and the volume of forgeries discovered at both residences that these three individuals were not intending to commit a single episode of forgery, but rather intended to continue forging currency and other documents over a period of time. *See id.*

Further still, the jury could consider Appellant's admissions during the recorded conversation with his mother. Specifically, during the conversation, Appellant acknowledged the involvement of others in creating what he knew to be forged currency and admitted that he burned the forged currency in his possession when he learned officers discovered the currency at Sharples and Aherns's residence. From this evidence, the jury reasonably could determine that Appellant created and, later, destroyed the forged currency in his possession, both overt acts in furtherance of the conspiracy with Sharples and Aherns.

In sum, the jury was entitled to consider the overall amount of forged currency discovered in Sharples and Aherns's residence, Williamson's having received forged currency from Sharples and Aherns, the similar printer/scanners and paper discovered at that residence and Appellant's residence, the fake identification cards bearing Sharples's, Aherns's, and Appellant's pictures, the receipt for the ink cartridges found in Sharples's vehicle, which was compatible with the printers in the residence being used to print forged currency, the text messages between Aherns and Appellant regarding forging currency and fake identification, and Appellant's admissions made

during the recorded conversation with his mother. Based on its consideration of this evidence, the jury reasonably could have found that there existed a combination and conspiracy between Appellant, Sharples, and Aherns to commit forgery. Furthermore, based on the evidence of the forged currency at Appellant's residence and his admission that he burned the forged currency, the jury reasonably could have found that Appellant committed the overt act of possessing forged currency or attempting to cover up or destroy evidence of the forgeries.

Based on our review of the entirety of the record, including the aforementioned evidence, we conclude that the jury reasonably could have found beyond a reasonable doubt that Appellant engaged in organized criminal activity with Sharples and Aherns. *See* TEX. PENAL CODE ANN. §§ 15.02(a), (b) 71.02(a)(8). Appellant's second issue is overruled.

**DISPOSITION**

Having overruled Appellant's first and second issues, we ***affirm*** the trial court's judgment.

**GREG NEELEY**
Justice

Opinion delivered January 15, 2020.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)

14

# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JANUARY 15, 2020**

**NO. 12-18-00323-CR**

**CARLOS EDWARD HULL,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 3rd District Court

of Anderson County, Texas (Tr.Ct.No. 87CR-17-33082)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*